## ERNEST OGLESBY v. STATE.

No. A-8766. Nov. 16, 1934.
(38 Pac. [2d] 32.)

Harrod & Harrod and Williams, Cowan & Benedum, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, P. J. Plaintiff in error, hereinafter called defendant, was convicted of murder in the district court of Oklahoma county and his punishment fixed at death.

On December 2, 1933, defendant shot and killed Douglas Gates, a police officer of Oklahoma City. A brief statement of the evidence surrounding the homicide is as follows: Defendant was a young man, about 27 years of age, with a criminal record of some 22 felony convictions in the state of Texas, having been convicted in seven different counties in that state, but under the irresponsible system sometimes prevalent he had been pardoned. He was living with a young woman to whom he was not married. They had spent the night preceding the homicide at a cottage at Camp Jackson, about a mile north of the State Capitol. About 8 o'clock in the morning defendant left the camp, drove south to Twenty-Third street, then west on Twenty-Third street to Robinson, and just west of this street the killing occurred. He was driving a Chevrolet coupe which had been stolen about two weeks before from warehouse of a dealer at Fort Cobb. On the car was a tag belonging to a car which had been stolen at Weatherford about a month before and which car had been destroyed by burning near El Reno. In the car, convenient to the driver, was a sawed-off automatic shotgun, fully loaded, and in addition a box of shells for the gun. Also there was a fully loaded automatic pistol which had been taken in a burglary at Kiowa, Kan., about three weeks before the homicide. At this burglary in Kansas, 200 pennies were stolen and pennies were scattered over the floor of the car driven by defendant. In the back of the car were two pinch bars and a sledge hammer. Defendant was also armed with a police special revolver with which the homicide was committed. The deceased Gates, a police officer, and Campbell, a companion police officer, were operating a scout car, being on duty from 1 a. m. to 9 a. m. They drove into a filling station at Camp Jackson and were in or about the police car at the time defendant

drove out. The police car had the usual police markings, the words "Police Car" and the police number on both sides and on the rear, ten or twelve inches in height, Gates and Campbell were in police uniform and had on overcoats and wore police shields or insignia; they also wore police caps with prominent badges in front. The shot that killed Gates struck the edge of the shield that he wore. As defendant drove out of Camp Jackson, Campbell consulted a list of stolen car numbers and discovered the car driven by the defendant bore tag of a stolen car. They immediately followed defendant, who drove at a high speed, and overtook him at the intersection of Twenty-Third and Robinson, where he had been stopped by a traffic signal. Campbell got out of the police car and went to defendant, made some inquiry and started behind the car to verify the number, defendant speeded his car, and Campbell jumped on the rear bumper or tire carrier as the car passed him. He called on defendant to stop, and in reply defendant fired through the glass in the rear, which knocked glass into Campbell's eyes, who then fired his own pistol twice, once through the glass. About this time defendant collided with another car coming from the opposite direction, and Campbell was thrown from the rear and was unable to say as to the other shot. Defendant got out of the car and fired twice into the police car, which was then in the middle of the street, and one of these shots struck and caused the death of Gates, who was at the wheel. Another car driven by a Mr. Case, who had his family in the car, was just behind the police car. Case, seeing the affray, stopped and backed his car around the corner into Robinson street, and defendant then went to that car and, with pistol in hand, forced the driver to take a circuitous route to May avenue on the west side of the city, stating the police or officers were after him.

After leaving the car of Case, defendant, who had been wounded in the left arm, went to a house a few blocks away, which had been rented by him the day before under a fictitious name, and was arrested there an hour or so later. At the time of arrest he denied any knowledge of, or participation in, the shooting. The pistol used was found concealed under a stove in the bathroom. At the trial defendant admitted the killing and admitted the various convictions and the serving of time under several of them. He explained his possession of the stolen car by stating he bought it from one McDonald a week or so before the homicide. That he was looking at used cars at Oklahoma City when this person, whom he did not know, came up and proposed to sell it to him. That he agreed to buy for $400, paid $200 down, and was to pay the other when he was furnished title, which was to be done December 5th. That McDonald gave the address of Enid, Okla., but gave no street number. That at the time he did not know the car contained the shotgun, the shells, and the automatic pistol, but that later McDonald told him that they were there. That he did not know the pinch bar and sledge hammer were in the car. He further testified he did not see the police car at Camp Jackson as he drove out and did not know it followed him. That he did not know deceased and Campbell were police officers. That he had trouble with one Red Shores in Texas, Shores had threatened him and he understood he was in Oklahoma City, and when the officer commanded him to stop he believed it was Shores seeking to make at attack on him, and he shot in his self-defense and only after the officers had fired and wounded him in the left forearm. That he did not discover the car deceased and Campbell were driving was a police car until after the shooting, and he then fled because he was frightened and did not know what to

do. He admitted he fled from the scene in the car of Case, but denied that he forced him to drive with a pistol, but that he held his pistol down by his side.

Two assignments of error are presented in the briefs:

First. Error of the court in refusing to instruct on manslaughter in the first degree.

Second. Misconduct of the county attorney in his closing argument.

These assignments will be discussed in the order presented.

At the time the court prepared his instructions, counsel orally requested the court to instruct on manslaughter in the first degree, which was refused and exceptions taken.

"Murder" is defined by Okla. Stat. 1931, § 2216, and "manslaughter in the first degree" is defined by section 2223, which is:

"Homicide is manslaughter in the first degree in the following cases:

"First. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"Third. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

In charging the jury it is the duty of the court to state to them all the matters of law which it thinks neces-

sary for their information. Section 3079. It is also the duty of the court, particularly in a prosecution for murder, to instruct upon the law applicable to the case, whether requested to do so or not. Collegenia v. State, 9 Okla. Cr. 425, 132 Pac. 375.

If, therefore, under any view of the evidence, whether of the state or the defendant, there is any substantial evidence tending to reduce the offense to a lower degree of homicide than murder, it is the duty of the court to instruct on such lower degree, but where there is no evidence tending to support the lower degree of the crime, but where all the evidence is that the killing is either murder or excusable homicide, then it is not necessary for the court to instruct the jury on the law of manslaughter. Williams v. State, 12 Okla. Cr. 39, 151 Pac. 900; Fray v. State, 46 Okla. Cr. 260, 285 Pac. 142.

It was the theory of the state, supported fully by its evidence, that the deceased and his companion discovered defendant under circumstances furnishing probable cause for believing a felony to have been committed and fully justifying them in apprehending him, and when they accosted him for preliminary questions before arrest, he began an attack, which resulted in the death of one of the officers; that such homicide is murder, without any circumstances of mitigation or any evidence tending to reduce it to the lower degree.

It was the theory of defendant, supported by his testimony, as in part heretofore stated, that he did not know that deceased and his companion were officers, or that they were intending or attempting to arrest him, but believed he was being unlawfully attacked, and the shots fired by him were in his self-defense. The court instructed upon this theory in instruction 13, as follows:

"You are further instructed that if you find from the evidence in this case that Webb Campbell and Douglas Gates, on the 3rd. day of December, 1933, at the intersection of 23d. Street and Robinson Avenue in Oklahoma City, Oklahoma, attempted to arrest the defendant, Ernest Oglesby for the larceny of an automobile or any other felony, and you further find that the defendant at the time did not know the said Webb Campbell and Douglas Gates, or did not recognize them as peace officers, and did not know or believe that they were peace officers intending to arrest him, and you further find that from the manner and conduct of the said officers it then and there reasonably appeared to the defendant that they were making an unlawful attack upon him, and without authority of law intended then and there to kill or inflict upon him some serious bodily injury, and that there was imminent danger of such unlawful intention being executed, as viewed by the defendant, from his standpoint, and you find that the defendant shot and killed the said Douglas Gates to avoid such threatened imminent danger to him, or if you entertain a reasonable doubt thereof, then it will be your. duty to find the defendant not guilty."

Under the theory of defendant he was innocent of any crime, was driving lawfully on the highway, and was accosted by deceased and his companion, who began an attack on him, and without knowledge on his part that they were officers, and that in repelling the attack deceased lost his life. Under this view of the evidence he was guilty of no offense, but was fully justified. There is no middle ground. Either defendant killed the deceased for the purpose of escaping arrest and in doing so committed murder, or he defended himself from an unlawful attack and was justified in slaying deceased. That the jury believed the evidence of the theory of the state is evident from the fact that they found defendant guilty and assessed the extreme penalty.

Considering the second assignment, i. e., misconduct of the county attorney. in his closing argument, this is predicated on the following:

While defendant was testifying, the widow of deceased, seated in the bar of the courtroom, made the following exclamation: "That is a dirty lie! You killed my husband, that is what you done."

No attention was paid to this outburst. The testimony was not interrupted; counsel proceeded with his examination without any break. The attention of the court was not directed to it and no objection or exception made. In the closing argument the assistant county attorney made some reference to this exclamation—the exact words used by him were not taken and are not in the record. Defendant's counsel objected and moved to strike out the argument and to instruct the jury not to consider it. Thereupon the court said:

"The jury is instructed that any reference as to what the lady knew about the facts should be stricken, and that the fact that she made the outcry should not be considered in the testimony; and counsel will now proceed with his argument."

Defendant's counsel contends the remark was inflammatory and prejudicial and deprived defendant of a fair trial, citing Childs v. State, 13 Okla. Cr. 461, 165 Pac. 622; Foster v. State, 25 Okla. Cr. 36, 218 Pac. 898. The reference of the county attorney to this statement of the widow was improper. If, under the evidence, it may have influenced the jury in reaching their verdict, it was prejudicial error. This is not a new question. The courts have considered such a contention many times. The rule is that although the county attorney may have made improper remarks in his closing argument, yet, if they are withdrawn from the consideration of the jury by the trial judge and

there is no reason to believe defendant suffered injury thereby, they are not grounds for a new trial. Todd v. State, 93 Tex. Cr. R. 553, 248 S. W. 695; Pendergrass v. State, 157 Ark. 364, 248 S. W. 914; Carroll v. U. S. (C. C. A.) 154 F. 425; Vaughn v. State, 25 Ala. App. 204, 143 So. 211; Bowlin v. State, 93 Tex. Cr. R. 452, 248 S. W. 396; Pointer v. State, 114 Neb. 13, 205 N. W. 574; Hulsey v. State, 172 Ga. 797, 159 S. E. 270; Smith v. State, 6 Okla. Cr. 380, 118 Pac. 1003; Gunnells v. State, 7 Okla. Cr. 98, 122 Pac. 264; Wood v. State, 3 Okla. Cr. 553, 107 Pac. 937; Davis v. State, 7 Okla. Cr. 322, 123 Pac. 560; Morgan v. State, 9 Okla. Cr. 22, 130 Pac. 522; Allen v. State, 13 Okla. Cr. 395, 164 Pac. 1002, L. R. A. 1917F, 210; Foster v. State, supra; Sewell v. State, 38 Okla. Cr. 225, 260 Pac. 84; Sanders v. State, 50 Okla. Cr. 274, 296 Pac. 764.

The exclamation of the widow of deceased was misconduct. A trial court should not tolerate interruptions or disorder, but of his own motion should promptly suppress it and admonish the jury. In the instant case counsel for defendant did not attach sufficient importance to the outcry to make any objection, but when it was referred to in the argument he objected and the court sustained the objection and instructed the jury that neither the argument nor the outcry should be considered. It was then not an abuse of discretion to deny the motion for new trial on this ground.

The nature of the charge, the aggravated circumstances under which the crime was committed, and the extreme punishment assessed have called the earnest attention of all the members of the court to the able briefs of counsel and the contentions made. We are satisfied defendant had a fair trial, that the verdict is just, and the death penalty fully warranted. There is no reason for

this court to set aside or modify the judgment. The case is affirmed.

The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Oklahoma county be carried out by electrocution of the defendant on the 4th day of January, 1935.

DAVENPORT and CHAPPELL, JJ., concur.