## HARRISON YOUNG v. STATE.

No. A-4886.  Opinion Filed Feb. 15, 1926.

(243 Pac. 763.)

L. F. Roberts and L. P. Mosier, for plaintiff in error.

Geo. F. Short, Atty. Gen., and Baxter Taylor, Asst. Atty. Gen., for the State.

EDWARDS, J. For convenience and brevity, the plaintiff in error will be referred to as defendant. The defendant was informed against for murder of Ad Black, alleged to have been committed in Osage county on the 10th day of December, 1921. He was convicted of manslaughter in the first degree, and his punishment fixed by the jury at 18 years in the state penitentiary. An application for an order that the case-made for appeal be furnished the defendant as a poor person was overruled. The case was brought to this court by a transcript of the record and the failure of the trial judge to order a transcript of the evidence assigned as error. Jeffries v. State, 9 Okla. Cr. 573, 132 P. 823; Hutchins v. State, 13 Okla. Cr. 717, 167 P. 338; Harris v. State, 10 Okla. Cr. 417, 137 P. 365, 139 P. 846.

Upon an examination of the transcript of the record, this court was of the opinion that the defendant was entitled to have transcript of the evidence taken furnished him without cost as a poor person, and, under the provisions of section 786, Comp. St. 1921, directed the trial court to have same furnished. This was done, and the entire record, including a transcript of the testimony, is at this time before the court.

The evidence discloses that the homicide took place at the home of the deceased, where a dance was being held. Both the defendant and the deceased had been drinking. At one time during the evening defendant brought his brother to deceased, and told him that his brother wanted a drink of whisky, and deceased then

referred to the brother by an opprobrious epithet, upon which defendant became angry, and started to leave the premises. Deceased then apologized, and informed defendant he was only joking. Later they again went out of the house and had gone but a short distance when defendant with a pistol fired one shot into the ground, and fired a second shot which passed through the heart of deceased, who died without speaking. The deceased was unarmed. There was some evidence that before the shots were fired deceased caught defendant by the collar. The defendant testified that he had been out with the deceased that day; that when they returned they had some whisky, which, at the direction of deceased, he put in the corner of the crib; that just preceding the difficulty he went out of the house and deceased followed him, took hold of his shoulder, and turned him around, and got him by the collar, and that he backed away, told the deceased to turn him loose, that he did not want any trouble, pulled out his pistol, and fired it into the ground, and again told the deceased to turn him loose; that he did not intentionally fire the second shot which killed deceased. After the deceased had fallen, the defendant walked away, and later returned to the house; was accused by the wife of the deceased with having killed her husband, which he denied, and said he had no gun, and asked that he be searched. There was some evidence, although contradicted, that the deceased when drinking was of a turbulent character.

The court instructed the jury fully as to the law of murder, and submitted to them the further issue of manslaughter in the first degree, and instructed them upon the law of self-defense and excusable homicide when committed by accident and misfortune, or upon a sudden combat.

The first assignment is based upon the exclusion by

the court of affidavits of the witnesses Charlie Marlar, Robert Marlar, and Jim Hendricks, who testified for the state. It appears that these witnesses, at some time prior to the trial, each had made an affidavit for the defendant to be used in an application for bail. Such affidavits in part are different from the testimony given. The witnesses admitted making the affidavits, and it was then sought to offer the affidavits in evidence. The court sustained an objection, and stated that the witness might be asked if he had made an affidavit in which he testified differently from what he did on the stand. Upon this point the following is shown by the record as to the witness Charlie Marlar, which will illustrate the contentions made:

"Q. Now, Charlie, you made an affidavit in this case, did you not? A. Yes, sir.

"Q. I will ask you, Charlie, if that is your signature [indicating]? A. Yes, sir.

"Q. And this is your affidavit? A. Yes, sir.

"Mr. Roberts: Now we want to offer the affidavit in evidence and have it marked Exhibit 5, I believe.

"Mr. Wheeler: We object.

"The Court: Objection sustained. (Thereupon counsel produces instrument which is handed to the reporter and by the reporter marked for identification as Exhibit 5).

"Mr. Roberts: I would like to ask the court upon what theory?

"The Court: Upon the theory that you may ask him if he testified or if he made an affidavit in which he testified different from what he has on the stand.

"By Mr. Roberts: I will ask you, Charlie, if you didn't say in this affidavit: 'State of Oklahoma, Osage County, Affidavit, Charlie Marlar being duly sworn says that he was at the home of Ad Black in December at a

dance, and that while there he saw Harrison Young leave the house, and said to Ad Black, "Come out, Black," and Ad Black replied, "I am coming," and Ad Black followed him, and that he followed them outside the door, and that when they had gone about 15 feet from the door he saw Harrison Young shoot into the ground, and that after the shot was fired Black grabbed Young, and Young backed away about 5 feet, with Black following him, having hold of him and clutching him when shot was fired, and Black was hit, and that he himself then turned at once and went into the house to phone a doctor.' Did you make that affidavit? A. Yes, sir. * * *"

Evidence, tending to show the interest or bias of a witness, may be properly elicited on cross-examination, and a witness may be impeached by showing that he has made statements different from the testimony given by him. In this case it was proper to inquire as to the fact of making the affidavit and of the contradictory statements therein made. The statement, however, was not competent as substantive evidence. The ruling of the trial court permitting counsel for defendant to read to the witness from his affidavit the statements made by him, claimed to be contradictory, was sufficiently liberal to bring squarely before the jury the statements claimed to be contradictory and sufficient to impeach the witness if the statements in the affidavit were contradictory. The entire affidavit is not necessarily admissible; for instance, it might be sought to contradict a witness by showing that the giving of testimony in some former trial was different from that in the trial then in progress—in such case the entire testimony of the witness would not be admissible, but only those parts claimed to be contradictory. There was no error in the ruling of the trial court on this point.

The second assignment of error is based on the court's instruction No. 15, submitting to the jury the issue of manslaughter in the first degree, in killing deceased in a

heat of passion, without a premeditated design. It is contended that there is no evidence of anger or heat of passion, and the instruction is not applicable to the facts proven. The correctness of the instruction as an abstract proposition of law is not questioned. There is no direct testimony that the defendant was in a state of anger or in a heat of passion at the time of the homicide, but the defendant did testify that there was a scuffle between him and the deceased; that the deceased was choking, him; that he had fired one shot into the ground as a warning. He further testified that a short time prior to the fatal difficulty the deceased had referred to the brother of defendant with an opprobrious term, upon which the defendant started to leave the premises. This might reasonably be construed as some evidence of anger on the part of the defendant at the time of the fatal difficulty.

It is next contended that the court erred in refusing defendant's request for an instruction upon manslaughter in the second degree. It is argued that, under the evidence, both the defendant and deceased were intoxicated, and at most the defendant was guilty of nothing more than culpable negligence in handling his revolver. Upon that issue the court instructed the jury that, if they believed the defendant drew his pistol to resist some threatened offensive made by deceased and for the purpose of deterring deceased, and in a struggle over the pistol it was accidentally discharged, their verdict should be not guilty. The offense of manslaughter in the second degree did not arise under the evidence in the case. There was no error in the court's refusal to submit that issue to the jury.

It is also contended that the court erred in instruction No. 5, wherein the court stated to the jury the theory of the defendant, and, in doing so, said: "The defendant neither admits nor denies that he fired the shot that killed deceased." This, it is urged, did not state the facts cor-

rectly, and would lead the jury to believe that the defendant was dissembling. The language, we think, cannot reasonably be taken as a comment or criticism by the court of the testimony of the defendant. The testimony of the defendant upon the firing of the second shot is rather ambiguous; upon that point the following appears in the record:

"Q. About how long did Ad Black have hold of you before you shot him?  A. I didn't shoot him. * * *

"Q. What was your purpose in firing that gun the first time?  A. Was to have him turn loose of me. * * *

"Q. You fired that first shot intentionally?  A. Yes; straight into the ground, just like that; right like that [indicating], straight into the ground. * * *

"Q. How long a time was it between the first shot and the second?  A. I could not possibly say.  We had backed some few feet.  I don't know just how far from the time of the first shot until the second one was fired.

"Q. Would you indicate to the jury by clapping your hands about the interval between these two shots?  A. Well, I would not know, because I did not know until the hold broke loose when this last shot was fired. * * *

"Q. You still had this pistol?  A. Yes, sir.

"Q. What did you do with it?  A. I put it back in the scabbard. * * *"

Finally, it is contended that the evidence is insufficient to sustain the verdict. This contention is not tenable. Where there is evidence from which the jury may reasonably and logically find a defendant guilty, its weight and value is peculiarly within the province of the jury. Although the evidence may be conflicting, this court will not substitute its judgment for that of the jury and set aside the verdict for insufficiency of the evidence.

Upon the consideration of the entire case, it appears

that the defendant was fairly tried, the issues fairly submitted, and there is no error that would warrant this court in disturbing the verdict.

The case is affirmed.

BESSEY, P. J., and DOYLE, J., concur.